UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
MONDAY I. EZEOCHA,

                      Plaintiff,

         - against -

INDUSTRIAL THREADED PRODUCTS
CORP.,

                      Defendant.
----------------------------------X

**MEMORANDUM & ORDER**
04 Civ. 1064 (DRH) (ARL)

**APPEARANCES :**

**LAW OFFICE OF EDWARD J. YULE, P.C.**
Attorney for Plaintiff
46 Woodbine Avenue
Northport, New York 11768
By: Edward J. Yule, Esq.

**LAW OFFICES OF LOUIS D. STOBER, JR., LLC**
Attorneys for Defendant
350 Old Country Road, Suite 205
Garden City, NY 11530
By: Louis D. Stober, Jr., Esq.

**HURLEY, Senior District Judge:**

      Plaintiff Monday Ezeocha ("Plaintiff") brought the present action against Defendant Industrial Threaded Products Corp. ("Defendant") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the New York State Human Rights Law ("NYSHRL") § 296, claiming he was discriminated against on the basis of his national origin. Defendant now move for summary judgment on the ground that Plaintiff "cannot make out a *prima facie* case of discrimination" as a matter of law. (Def.'s Mem. at 3; *see also* Def.'s Reply at 4.) Plaintiff

-1-

opposes the motion. For the reasons set forth herein, Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

*BACKGROUND*

The following summary of facts is drawn from the parties' Local 56.1 statements, and the parties submissions. The facts are undisputed unless otherwise noted. Plaintiff was born in Nigeria, and is in the United States with a permanent visa. Defendant is a corporation involved in the manufacturing of various custom metal products, with its primary place of business in Bay Shore, New York.

Defendant employs approximately twenty employees who perform various functions such as welding and the fabrication of products. Plaintiff was employed by Defendant as a shop helper from November 2000 until his termination on July 6, 2001. A shop helper performs manual labor tasks, and Plaintiff's duties entailed painting, cleaning, and assisting other employees as necessary.

In the course of his employment, Plaintiff alleges that he was the frequent victim of hostile behavior by his co-workers. He alleges that co-workers repeatedly joked that they would have him deported or that they would call the police on him and make phony drug charges. These co-workers were "predominantly" of "Puerto Rican descent." (*See* Pl.'s 56.1 Counterstatement ¶ 12.) Plaintiff alleges that Angel Liciaga, a foreman, and Luis Liciaga, his son and a welder, were the worst of his oppressors.

Plaintiff complained a number of times about mistreatment by other employees. Plaintiff asserts that on four isolated occasions, he complained to the shop manager, Mosser (*see* Dep. of Monday Ezeocha, dated Feb. 15, 2005 ("Pl.'s Dep.") at 30), regarding the mistreatment. Mosser

testified that Plaintiff had complained "two or three times . . . [t]hat people were picking on him."  (*See* Dep. of Donald "Gus" Mosser, dated Feb. 7, 2005 ("Mosser Dep."), at 22.) Mosser testified that he never took any affirmative action to prevent other employees from picking on Plaintiff: "I said that you have to try and do your job and I will talk to people. People are people. You're not going to stop them." (*Id.* at 23.)  Nevertheless, Mosser did not recount or recall the incidences with any particularity.  Consequently, Plaintiff's account is virtually undisputed.

The first incident involved Luis Liciaga telling Plaintiff to "go back to [your] F country," and, on the same day, Luis throwing a cigarette in front of Plaintiff as Plaintiff walked by. (*See* Pl.'s Dep. at 31-32.)  At that point, Luis "brought out the white substance. He said it was marijuana. He said if I should live in this country I should hold this, he would call the cops and the next day I would be in my country." (*Id.* at 32.)  The second incident involved Luis pulling the plug on the machine that Plaintiff was using and then "cussing" Plaintiff in Spanish. (*See id.* at 36.)  Plaintiff is uncertain whether Luis actually swore at him, but he assumed that he was swearing because "I don't think he would use a language I don't understand if he was saying something good about me." (*Id.*).

The third incident involved welders being told to hide from "inspectors."  According to Plaintiff, "there was a day some inspectors came to the shop–I don't know what they came to inspect–and [Mosser] asking the workers to hide in the back." (*Id.* at 39.)  Angel Liciaga approached Plaintiff and told him "to hide like all the welders" or else he would be fired. (*Id.*)  Plaintiff perceived hostility in Angel's tone and demeanor.  It is undisputed, however, that Angel Liciaga, despite his statements, had no authority to fire Plaintiff.  (*See* Mosser Dep. at 25.)

The fourth incident occurred when Angel told Plaintiff to go outside and paint in the cold. Plaintiff complained to his supervisors, who told him to ignore Angel and to do some other task until the weather was better. (Pl.'s Dep. at 42-45.) Nothing further happened at that time.

The incident that stands at the center of this suit occurred on July 6, 2001. Unfortunately, the parties had great difficulty providing a straightforward account of the incident, undisputed or not. As best the Court can surmise, Plaintiff was outside, painting. Apparently, Plaintiff observed Luis Liciaga and Angel Liciaga writing on a piece of pipe that Plaintiff was using, "You don't know what the F you are doing. Go back to your F country." (*Id.* at 46.) Plaintiff testified, however, that he "wasn't bothered" by the note. (*Id.* at 47.)

Sometime later, however, Plaintiff alleges that Luis "came out and started telling me that I'm doing nothing, I'm too slow, that I"m just playing, that I should look for something to do." (*Id.*) Plaintiff began to argue with Luis. Plaintiff alleges that, at that point, Angel came to his son's defense. It is unclear where this confrontation took place. Plaintiff first alleges that Luis "came out" (*id.*), but just a moment later indicates that Angel "push[ed] me out of the shop" (*id.* at 48.) Plaintiff later stated that it took place "[j]ust inside, but almost at the gate." (*Id.* at 57.) Plaintiff does not explain how the incident ended, but indicates that he immediately went to speak with Mosser. Mosser told him to go back to work and try to avoid further conflict. Mosser specifically directed Plaintiff not to enter the metal shop area. At this point, Plaintiff and Defendant's accounts diverge.

Plaintiff acknowledges that Mosser "told me to stay outside and work," but admitted that he reentered the shop "to take the material I work with." (*Id.* at 50.) Thus, he was working outside, but re-entered the workshop to obtain more paint. When he did so, another shouting-

match erupted between Plaintiff and Angel Liciaga, during which Plaintiff said that he would report Angel to the union. (*Id.* at 55.) At that moment, Plaintiff contends, he was approached and punched by Ivan Reyes, a welder who had been with the company since October 2000 (*see* Decl. of Ivan Reyes, dated July 29, 2005, ¶ 1), who was apparently upset by Plaintiff's threat to Angel. "[H]e decided to come and punch me. I had nothing to do with him that day." (Pl.'s Dep. at 62.) After Reyes allegedly threw a punch, striking Plaintiff on the chin, Plaintiff "rushed into him and he fell down." (*Id.* at 64.) According to Plaintiff, Reyes immediately got back up. (*Id.* at 65.) "That was when Gus [Mosser] came out."

Defendants' account is slightly different. After the first argument, Mosser told Plaintiff to stay out of the shop. Mosser contends that a short while later, he came out of his office to see Plaintiff in an argument in the shop area: "All I know is that he was told to stay outside and he was back inside. The argument wasn't outside. The argument was inside. He was supposed to be outside." (Mosser Dep. at 31.)

Defendants contend that Mosser "tried to talk Plaintiff into leaving the metal shop area," but that Plaintiff "pushed Mr. Mossler [*sic*] away and ran towards another employee and attacked the employee with a rage." (Def.'s 56.1 Statement ¶¶ 30-31; *see also* Mosser Dep. at 32.) It is unclear from Defendants' account who "the employee" was. Nevertheless, Defendants assert that Plaintiff attempted to attack the "shop foreman" (Def.'s 56.1 Statement ¶ 32) – which the Court assumes to be Angel – but that Reyes intervened. (*See* Mosser Dep. at 32 ("I think he charged Angel . . . Ivan jumped in between them.").) Reyes declared that Plaintiff "started threatening me, yelling repeatedly that he was going to kill me." (Reyes Decl. ¶ 13.) During their scuffle, Defendants contend that Plaintiff "flipped" Reyes and knocked him unconscious.

(Mosser Dep. at 34-35; *see also* Reyes Decl. ¶ .)  Thus, contrary to Plaintiff's account, it was Reyes who was defending himself, not Plaintiff.  (*See* Mosser Dep. at 37 ("[Reyes] wasn't the attacker.  He was in his place, in his work station.").)

After the fight, Mosser sent Plaintiff home.  Plaintiff was subsequently fired.  The termination form stated that Plaintiff was terminated because of his "conduct," "insubordination," "safety," and "aggressive behavior followed by physical assault on another employee."  (*See* Def.'s 56.1 Statement, Ex. 2.)  Reyes's employment, however, was not terminated.

Plaintiff filed the present suit on March 15, 2004, alleging that Defendant "intentionally discriminated against and harassed Ezeocha on the basis of his national origin, in violation of Title VII . . . ."  (Compl. ¶ 22.)  Defendant now moves for summary judgment.  Plaintiff opposes the motion.

*STANDARD*

Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Fed. R. Civ. P. 56(c)).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying those materials "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Second Circuit has "noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 603 (2d Cir. 2006). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*DISCUSSION*

The Complaint is not a model of clarity, but a liberal reading of the First Cause of Action suggests that Plaintiff is bringing discrimination claims of both wrongful termination and hostile work environment. (*See* Compl. ¶ 22.) Defendant treats the Complaint as having made both claims, and the Court does the same.

The Court notes that claims of discrimination brought under New York state law are analyzed using the same framework as claims brought under Title VII, and the outcome under state law will be the same as the outcome under Title VII. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F .3d 708, 714-15 (2d Cir.1996). Thus, as the Court addresses the wrongful termination and hostile work environment claims separately below, the reasoning will also stand as analysis of the viability of the state law claims.

I. *Wrongful Termination*

Defendant moves for summary judgment on the grounds that Plaintiff has failed to establish a *prima facie* case of national origin discrimination. Plaintiff offers a simple retort, contending that issues of fact remain to be decided at trial.

Plaintiff brought his claim of national origin discrimination pursuant to Title VII. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where a plaintiff alleges individual disparate treatment but relies on circumstantial evidence of discrimination, a familiar tripartite burden-shifting test governs the court's analysis of whether there remains a triable issue of fact. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

In order to establish a *prima facie* case of national origin discrimination, Plaintiff must show (1) he was a member of a protected class; (2) he applied for an available position for which he was qualified; (3) he suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination. *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant, who must then offer a legitimate, non-discriminatory rationale for his actions. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Once the defendant offers such a rationale, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on

discrimination." *Id*. (citation and internal quotation marks omitted). Under this analysis Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id.*

The parties do not dispute that Plaintiff was a member of a protected class (Nigerian), that he was qualified for the position he held, and that he suffered an adverse employment action (he was terminated). The only factor at issue, then, is whether the circumstances surrounding the adverse employment action could allow a reasonable finder of fact to make an inference of discrimination.

Regarding the remaining fourth factor, the Court must determine whether the proferred evidence shows circumstances that would be sufficient to permit a rational fact-finder to infer a discriminatory motive. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997). The Second Circuit has recognized that circumstances contributing to an inference of discrimination include "the employer's continuing, after the employee's discharge, to seek applicants from persons of employee's qualifications to fill that position, an employer's criticism of plaintiff's performance in ethnically degrading terms, an employer's invidious comments about others in employee's protected group . . . . " *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); *see also Jamieson v. Poughkeepsie City Sch. Dist.*, 195 F. Supp. 2d 457, 468 (S.D.N.Y. 2002). A plaintiff may also show that the circumstances surrounding the adverse employment action give rise to an inference of national origin discrimination by demonstrating that "similarly situated employees of a different [national origin] were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare [him]self must be similarly situated in all material respects." *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997) (citing

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "Similarly situated" must be judged based on "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

Plaintiff has provided no direct evidence of discrimination on the part of his employer.[1] Plaintiff does point to one co-worker, however, who was purportedly similarly situated and received favorable treatment: Ivan Reyes, the employee with whom Plaintiff fought. According to Plaintiff, Reyes engaged in exactly the same conduct, but he was not fired though Plaintiff was.

Plaintiff has failed to show, however, that he and Reyes were similarly situated in all material aspects. First, Plaintiff has failed to show that they occupied similar position, had the same supervisors, or had similar experience. As a result, Plaintiff has not shown that he and Reyes were subject to the same workplace standards. Furthermore, Plaintiff has failed to demonstrate that he and Reyes engaged in similar conduct. Plaintiff does not dispute the fact that he was directed by Mosser to stay outside, but re-entered the work shop. (Pl.'s Dep. at 50 (acknowledging that Mosser "told me to stay outside and work," but admitted that he reentered

---

[1]The only allegation that approaches such evidence is Plaintiff's assertion that "Mr. Shtrachman" indicated that employees "of Puerto Rican decent [*sic*] were treated better by management than those of non-Puerto Rican decent [*sic*]." (Pl.'s 56.1 Counterstatement ¶ 14.) Plaintiff cites to a State of New York Executive Department Division of Human Rights Inter-Office memorandum as the basis for his assertion regarding Mr. Schrachman's comments. (*See id*., Ex. 6 at 3.) Plaintiff also offer a sworn affidavit by Shrachman, however, that repudiates the memorandum's paraphrase of his comments, stating, "I never told anyone that the Puerto Ricans were treated better by management." (*See* Defs.' 56.1 Statement, Ex. 5.) Thus, Mr. Shrachman's comments do not support Plaintiff's *prima facie* case.

the shop "to take the material I work with.").) He does not dispute that he, thereby, initiated the second shouting-match with Angel Liciaga wherein Plaintiff threatened to report Angel to the union. (Pl.'s Dep. at 55.) Thus, Plaintiff disobeyed a direct order from management, engaged in a verbal confrontation with a superior in front of the other employees, and his disobedience precipitated a physical altercation. Reyes did none of these things.

In sum, Plaintiff has not only failed to show that he and Reyes were subject to the same workplace standards, but he has also failed to show that he and Reyes engaged in comparably insubordinate behavior. Accordingly, he has not shown that a similarly situated employee received favorable treatment that would create an inference of discrimination, and has failed to establish the fourth factor.

The Court also notes that had Plaintiff established a *prima facie* case, Defendant would still be deserving of summary judgment because Plaintiff does not dispute the legitimate rationale proffered by Defendant to explain the termination: Plaintiff was in a fight with a co-worker and he was fired the next day. There are few circumstances more deserving of termination than a physical fight with a co-worker. *See, e.g., Harris v. Leboeuf, Lamb, Greene & MacRae, LLP*, 29 Fed. Appx. 733 (2d Cir. 2002) (upholding the district court's grant of summary judgment on the grounds that "altercations with other employees" is a legitimate rationale for terminating an employee); *Tanay v. St. Barnabas Hosp.*, No. 99 Civ. 9215 (JGK), 2001 WL 262695, at *7 (S.D.N.Y. Mar. 15, 2001) ("defendant has articulated a legitimate, nondiscriminatory reason for her transfer, namely her undisputed altercation with her co-worker"); *Boyle v. National R.R. Passenger Corp.*, No. 03 Civ. 905 (KAJ), 2004 WL 2435291, at *3 (D. Del. Oct. 15, 2004) ("Plaintiff's threats of violence and physical violence against a co-worker are legitimate reasons

for Plaintiff's termination."); *cf. Doherty v. Nederlander Producing Co.*, No. 04 Civ. 3324 (LTS/JCF), 2006 WL 2239421, at *7 (S.D.N.Y. Aug. 4, 2006) (granting summary judgment to employer because "Plaintiff does not dispute that the altercations occurred or that they were investigated"). Plaintiff does not dispute that he was fired as a direct result of the fight, and raises no argument to suggest that the legitimate rationale is merely pretext for discrimination against Defendant because of his national origin. Furthermore, Plaintiff agrees that the re-entered the work shop area after being directly ordered not to do so. Thus, the reasoning that he was fired for "conduct," "insubordination," "safety," and "aggressive behavior followed by physical assault on another employee" is unerringly consistent with the undisputed facts. (*See* Def.'s 56.1 Statement, Ex. 2.)

Plaintiff is essentially asserting that the reason that Reyes was *not* fired is pretextual. That being the case, the question is not whether Defendant made the right business decision in firing Plaintiff (as opposed to Reyes), but rather whether the reason for firing Plaintiff was discriminatory. *Cf. Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age."). Accordingly, Plaintiff fails to demonstrate that the proffered legitimate rationale for firing Plaintiff was pretextual.

As a result, not only did Plaintiff's termination occur under circumstances that fail to create an inference of discrimination, but he has failed to provide any argument, let alone a scintilla of evidence, to suggest that Defendant's legitimate rationale was pretextual. Accordingly, Plaintiff has failed to demonstrate that a reasonable trier of fact could legitimately

conclude that his national origin was a factor leading to his discharge. Accordingly, the Court grants Defendant's motion for summary judgment as to the wrongful termination claim.

*II.    Hostile Work Environment*

Defendant also move for summary judgment to the extent that the complaint alleges a hostile work environment claim. Plaintiff failed to address this argument in his memorandum.

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). To prevail on a hostile work environment claim, a plaintiff must demonstrate: "(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996) (quotation omitted); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). The conduct alleged must be severe and pervasive enough to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* at 23 . As the Supreme Court has stated, " 'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Id*. at 21 (quoting *Meritor*, 477 U.S. at 67) (citation omitted; alteration in *Harris*). For racist comments, slurs, and jokes to constitute a hostile work environment, there must be "more than a few isolated incidents of racial enmity," *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986), meaning that "[i]nstead of sporadic

racial slurs, there must be a steady barrage of opprobrious racial comments." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994); *see also Ways v. City of Lincoln*, 871 F.2d 750, 754 (8th Cir. 1989). Thus, whether racial slurs constitute a hostile work environment typically depends upon "the quantity, frequency, and severity" of those slurs, *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir. 1994), considered "cumulatively in order to obtain a realistic view of the work environment." *Doe*, 42 F.3d at 444; *see also Harris*, 510 U.S. at 23; *Schwapp*, 118 F.3d 106, 110-11 (2d Cir. 1997).

When analyzing a hostile work environment claim, the Court looks to the record as a whole and assesses the totality of the circumstances, considering a variety of factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (stating the rule as whether the hostility was "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse"). Nevertheless, "it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citing *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (vile and sexually explicit verbal abuse of a female firefighter that challenged her competence, was witnessed by a large group that included her subordinates, and created a justified fear that she would be left in peril at fire scenes); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)

(observing that a single sexual assault may be sufficient to alter the terms and conditions of the victim's employment)).

According to Plaintiff, there were five incidents in total that constituted the hostile work environment. The first incident involved Luis Liciaga telling Plaintiff to "go back to [your] F country." (*See* Pl.'s Dep. at 31-32.) The second incident involved Luis pulling the plug on the machine that Plaintiff was using and then "cussing" Plaintiff in Spanish. (*See id.* at 36.) The third incident involved Plaintiff being told "to hide like all the welders" from "inspectors" or else he would be fired. (*Id.* at 39.) The fourth incident occurred when Angel told Plaintiff to go outside and paint in the cold. (*Id.* at 42-45.) The fifth incident is the day of the fight when Luis Liciaga wrote a note to Plaintiff that stated, "You don't know what the F you are doing. Go back to your F country." (*Id.* at 46.) This note precipitated a confrontation with Luis, then a confrontation with Angel, Luis's father, and ultimately to the above-discussed fight with Ivan Reyes.

Clearly, the second third and fourth incidences demonstrate no hostility toward Plaintiff's national origin. Those comments might demonstrate some general hostility toward Plaintiff (though the third incident, where Plaintiff was directed to hide, just like everyone else, would seem to merit the opposite conclusion), there is no indication that they were directed at the fact that Plaintiff was not American-born.

As for the first incident, though it was obviously directed at Plaintiff's national origin, it is best described as a "mere offensive utterance," that did not interfere with Plaintiff's job performance. *See Demoret*, 451 F.3d at 149. Indeed, Plaintiff nowhere indicates that any of the incidences interfered with his job performance in any way.

The fifth incident – the fight – however, is more difficult. Plaintiff engaged in a physical altercation that apparently started because of a pejorative comments by Luis and Angel Liciaga that were directed at Plaintiff's national origin. A reasonable fact-finder, depending upon who's version of the facts he believes, could find that the conduct by Plaintiff's co-workers during the fifth incident was sufficiently severe and physically threatening that it "unreasonably interfered" with Plaintiff's work. After all, it interfered to such an extent that he lost his job. As a result, a reasonable fact-finder could conclude that the hostility Plaintiff suffered were sufficiently severe so as to alter the conditions of his work environment.

As for the second prong, "an employer will be liable in negligence for a . . . hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir.1999) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)); *see Whidbee*, 223 F.3d at 72; *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir.1998). Mosser testified that he did receive a number of complaints by Plaintiff regarding the way his co-workers were treating him and that he never took any affirmative action to stop the behavior. (*See* Mosser Dep. at 23 ("I said that you have to try and do your job and I will talk to people. People are people. You're not going to stop them.").) Thus, it is undisputed that Defendant was aware of the hostile conduct and took no action to prevent it. Plaintiff has established the second prong. That being the case, the Court denies Defendant's motion to dismiss the hostile work environment claim.

*CONCLUSION*

In sum, Plaintiff has failed to make out a *prima facie* case that he was wrongfully terminated on the basis of his national origin and the Court GRANTS Defendant's motion to dismiss the wrongful termination claim, pursuant to both Title VII and New York State Human Rights Law. With regard to the hostile work environment claim, however, a reasonable finder of fact could find that hostility toward Plaintiff's national origin so permeated the work place that it materially altered Plaintiff's conditions of employment for the worse. Accordingly, the Court DENIES Defendant's motion to dismiss the hostile work environment claims, pursuant to both Title VII and New York State Human Rights Law.

**SO ORDERED.**

Dated: Central Islip, N.Y.
      September 27, 2006

/s/
Denis R. Hurley
United States Senior District Judge